Thank you, Your Honors. May it please the Court, my name is Joshua Block and I represent the plaintiff, G. G. Over the past 15 years, the vast majority of courts have recognized that discriminating against someone because they're transgender is a form of discrimination on the basis of sex. Under Title IX, that means it's perfectly fine for schools to have separate restrooms for boys and for girls, but they have to let transgender boys and girls use those only way that can happen is if they're allowed to use restrooms consistent with their gender identity, just like every other student at the school is allowed to do. The school has said that G. can use the girls' room, but it's really impossible to take that claim seriously. It makes no sense whatsoever for the Board to say it's going to protect student privacy by taking a transgender boy who's on testosterone and has facial hair and a male ID card from the state and place him in the girls' restroom. The record shows that even before G. transitioned, girls objected to his presence in the restroom because they accurately perceived him to be a boy. No one seriously thinks that having G. use the girl... Is it different if the boys object when he goes in the boys' restroom? I mean, the girls objected, apparently, and you're pointing out that that's significant, but apparently the boys objected when he went to the boys' restroom. Is that allowed to be taken into account, too? Well, Your Honor, I'm saying the school board's own arguments are inconsistent here. If the rationale is privacy, then... I'm taking a point that you've made, you made in your brief, is that he can't go into the women's restroom because he doesn't feel welcome there, and the women ostracize him and don't want him there. They basically, some in the fact... Is it also a meaningful fact that the boys say the same thing in their restroom? Well, Your Honor, it is a meaningful fact, and that privacy interest can certainly be taken into account, but there are right ways to do that, and there are wrong ways to do that. Schools can and should have privacy protections for everyone, like urinal stall dividers and privacy strips on stalls, and schools can and should have private restrooms for anyone to use if they want to, but what schools can't do is ban estranged gender students from the restrooms entirely because students object to their presence. If we don't recognize our, I think that's the way you say the case, our deference, can you prevail on your Title IX claim? Absolutely, Your Honor. How? Well, the plain text of Title IX is extremely broad. It covers all sex-segregated facilities entirely. Congress recognized that the plain text would prohibit separate restrooms for separate dormitories. That's why they had a specific exception in the text permitting separate dormitories. Well, you know, the thing that concerned me a little bit is the argument between ambiguity and not being ambiguous. Let me give you a line of questions. Which restroom would an I think that's a great question for the Department of Education to weigh in on. We'd like to hear your answer because if the thing's ambiguous, the decision goes one way. It's not ambiguous. It goes the other way. Well, Your Honor, I think it would depend on that person's intersex condition and what gender identity they lived their lives in accordance with. But it is a very accurate point that there is an article about uterus transplants for women born without uteruses, but their gender identity is female and they live all their lives as women. It's not like the categories of male and female always correspond to everyone's internal reproductive organs or chromosomes. Which restroom would a person who's undergone a sex change use? Well, Your Honor, I think they would use the restroom consistent with their gender identity, which is whatever gender they live in accordance with in all aspects of their lives. But again, Your Honor, I think it's important to remember that the structure of Title IX is that Congress wanted the agency to make these distinctions. There's no BFOQ exception in Title IX like there is in Title VII. And that's because the sponsor said that would be too big a loophole. And when people asked, what about restrooms, Senator Byde didn't say, oh, don't worry, restrooms aren't covered. He said the agency can address those questions in its discretion. So the entire statute is structured so that the agency draws these distinctions about what sports teams can women try out for. What conditions do you need to have separate sex-segregated restrooms? And the courts don't weigh on their own, oh, is the volleyball team different than the football team? That these are agency policymaking questions. And the agency is the democratically accountable branch, and Congress can overrule the agency and has done so in the past. But even if no difference applies, Judge Ludig's decision in Mercer v. Duke is extremely important here. He interpreted the plain text of a different exception that allowed schools to block women from trying out for all-male contact sports. And the school argued that means that contact sports are exempt. And Judge Ludig said, no, you have to interpret that regulation narrowly. And he said it allows women to be prohibited from trying out. But once you're on the team, the school can't say that the baseline here is all forms of disparate treatment are prohibited unless there's affirmative permission for it. And what the regulation that DOE passed says is it said you can have separate restrooms. You can have restrooms for one sex if they're equivalent to restrooms for another sex. There are two things that doesn't address. It doesn't say you can have sex-segregated restrooms, but then not let transgender people use them. They have to be able to use one of those restrooms. And it didn't say where a transgender person should go if their gender identity conflicts with their sex assigned at birth. And the reality is that until recently... Let me ask you to relate this to a locker room situation. I know the locker room is not an issue in this case, but it's in the policy and it's in the regulation. And the regulation says that you based on sex. Where would the intersex person go when a school has a men's locker room and a women's locker room? An intersex person or a transgender person? I'll take either one. You can answer both if you want. Yeah. Well, they would go to the locker room consistent with their gender identity and the Department of Education has... So if they're anatomically a male and they identify as a female, they would go to the female locker room even though they have the genitalia of a male? Is that your answer? Yes, it is, Your Honor. But that's also because it's important to understand there's a lot of privacy protections in locker rooms too. And it's important that... Well, I don't know when the... I've been in locker rooms my whole life and you have open showers and you have open spaces and it's a much more exposed environment. Not at Gloucester High School. At Gloucester High School, you have separate shower and changing areas for all the schools. And that's actually part of the Virginia Department of Schools guidelines for how locker rooms should be set up. So, I mean, it is important that we're talking about these policymaking questions that locker rooms are different than when I went to school. They're different from when my parents went to school. And these issues can and are addressed on the ground in different ways. And it's hard... Let me ask you this question. It's sort of a... These are logically difficult questions, but sticking with the locker room person had male genitalia but identified as a female, that person should be allowed in the female locker room. That's because an aspect of sex is the psychological. There's the physical and the psychological and they both make up a person's sex or gender. And in most people, the person identifies with his anatomical arrangement. But in some people, that's not so. So we have a disparity. You picked, in order to give your answer, you picked the psychological identification of the person going into the women's locker room. Could the school, instead of picking the psychological, pick the anatomical criteria as the reason for separating locker rooms and saying, well, since he's anatomically male, he should go to the male locker room? Legally under the regulation. Well, if the Department of Education hadn't given its own interpretation... No, no. I just want you to read the regulation. Well, Your Honor, I think on its face, the regulation doesn't answer that. I think both of those... Well, what's the basis for us determining which locker room the student goes to? Yeah, well, but with respect, I think under our deference, the question isn't what the court would select. Well, still, we need to know, don't we? Well, I mean, if the district court got it totally wrong, we can't make that assessment unless we have some idea as to which way you're supposed to go. Well, Your Honor, I think the country, transgender students use locker rooms consistent with their gender identity. No one knows they're transgender in many circumstances. A person who is a male to female transgender person often views the male anatomy as deeply shameful. They're not going to be... It's not something that trans kids are going to want to... They have a sense of privacy, too. And I think you did draw this dichotomy between psychological and physical, but as a result of hormones... They're linked, but there's a divergent in a transgender child who finds himself or herself with one gender or one sex physical apparatus, so to speak, reproductive organs and so forth, and identifies with the other. That divergence creates the answers say the school should be focusing on the psychological, what the person identifies with, as opposed to what a person's physical anatomy is. And I'm just wondering what gives you the basis to make that interpretation under the statute, as opposed to the school's interpretation to use the anatomical difference? Well, to address this dichotomy, though, as a result of hormones, there are real physiological differences between G and non-transgender women. You're not taking care of my clear question, which is somebody who is physically one sex and identifies with the other. Yes, I understand. Any definition as the psychological definition of this? Well, yeah. All I'm saying is that what someone's physical body is also very much affected by their hormones, and that is a real life physical component. But on this, what gives me the right to say they should use gender identity instead of sex assigned at birth? What basis do I have for saying that? That's what the Department of Education says, based on its expert agency status. It's the one that is a policymaking entity. It's the democratically accountable branch. And if school disagrees with them, they can file a rulemaking petition. Congress can overrule them. I don't believe that in the rule. I've got the rule right before me, and it says a recipient may provide separate toilet, locker room, and shower facilities on the basis of sex. But such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex. And that's the regulation. So the regulation says the school can make a decision based on sex and have separate facilities. Now, your argument, I gather, is that here we have sex as a complex word and includes both the physical and the psychological. And when you have it different, then the question is, what does the statute say? I don't think the statute addressed that. Well, I think that's exactly right. The statute doesn't address it. I think, you know, as you said, at best, there are two equally viable alternatives. But if the statute if you can make a distinction based on sex, so now if you're going to take both the psychological and the physical, we have a third category where that's divergent. And so the argument would be you could provide a separate facility for that third category, like a unisex bathroom. But how about a unisex locker room of some kind or intersex locker room? But I'm not sure that's what you're arguing. Well, I mean, Your Honor, if the regulation doesn't actually address it, then the default is it's prohibited. That's the inertia is in favor of the person enforcing Title IX. You need an affirmative exception. The fact that a regulation is silent cuts against the school board. It doesn't cut against our side. You didn't argue for transgender status to be a suspect classification. Why not? I see my time has expired. Can I? Okay. We didn't because transgender status also is discrimination on the basis of sex. And it's there's a big body of precedent saying it gets heightened scrutiny. We don't disagree that it's a suspect class, but I don't think you need to find an independent suspect class status. All right. Thank you, Mr. Block. You have some time on rebuttal. Mr. Corrigan. May it please the court. I'm David Corrigan and along with my partner, Jeremy Capps, who was the primary author of the brief, we represent the Gloucester County School Board, and we're here to argue for affirming the dismissal of the Title IX claim, ordering the dismissal of the equal protection claim and affirming the decision to deny the preliminary injunction. Our position is that there was no discrimination. Just on that is just a practical point. The district court explicitly said it wanted to hear more on the equal protection claim and preserve that for trial. You're asking us to make a ruling before the district court analyzes that, I guess, based on jurisdiction. Well, I'm not thinking about the jurisdiction. I'm just wondering what the wisdom is of us doing the equal protection analysis and your argument, I guess, based on the facts of this case, we can do it just as well as the district court. Yes, sir. And because it's all intertwined, the analysis is so intertwined. Whether it is, I mean, I think your Title IX case is pretty clearly interposed with the injunction because it's based on that, isn't it, the injunction of Title IX? The injunction is based on, it seems to me that the trial judge based it on both the fact that the Title IX was dismissed and he got into the balancing of the hardships in deciding that there was a balance. So it's another reason that I read the court is eliminating the injunction. Yes, sir. On the question of the balance, I'm a little puzzled by the district court's decision because things were proceeding, the status quo ante was changed by the policy, correct? It was a prohibitory injunction. We agree that that's what it was. So I'm not clear why the balance of hardships favors your client rather than the plaintiff. Well, even under either scenario with a preliminary injunction, you're looking at a discretion, an abuse of discretion standard, clear error with respect to the facts and de novo on the law. So we have the, if we talk first, our argument primarily at the lower level was that we should win as a matter of law, both on Title IX and on equal protection. But in getting into the balance of hardships, what I understood the court to say, and this is what's on the record, is that this plaintiff is a female who has a gender dysphoria condition and identifies male and had significant distress well before anything having to do with restrooms ever came up and continued to have that distress. And that there was an insufficient or the facts in support of the plaintiff side of that amounted to three paragraphs in the psychologist report and the self-serving declaration of the plaintiff about the concerns that he had. On the other hand, on the other side was... But the denial of the preliminary injunction changed the status quo, did it not? I don't know that it changed the status quo. I think that the... Well, surely you must know. The young man, or the G, the plaintiff had been using the restroom. And that's the status quo. After they passed the resolution, he was no longer allowed to use the restroom. So the denial of the preliminary injunction changed the status quo. It did. Okay. I don't quite understand that. I thought... This is just on the facts. I thought that the school adopted a policy, which is challenged here. Yes. And built three restrooms, unisex restrooms. Correct. And that the policy is the status quo. They changed earlier. They had him using the men's restroom. And then because of complaints, they conducted meetings and adopted the policy, which is at issue here. And the policy says that the person using the common restrooms will follow their biological makeup and anybody can use the unisex restroom. Correct. And that's the challenge. Now, that's the... The anti before the policy was he was using the bathroom, but the policy was not prompted by the lawsuit, was it? That was changed before the lawsuit? Right. The policy existed before the lawsuit. The policy, what occurred with the policy is this. The policy is a statement of existing situation, which is we have two sets of restrooms. We have female restrooms to be used by people of the female sex. We have male restrooms to be used by male individuals of the male sex. And then we have a third alternative that we have developed that is available for all students. And that's one of the important facts in the case is it's not... The policy itself doesn't say that, but the plaintiff has pled as... And the injunction requested is that Gigi be allowed to use the boys restroom. Right. That's the full scope of the injunction requested. And the... The state of affairs was before the policy and before the lawsuit, correct? The... Gigi was using the boys restroom up until the policy was passed. Gigi is now not using the boys restroom. Well, what harm occurred during the seven weeks that he used the boys restroom? The... On this record, the concerns that were raised... And we go to the precedent in this court in terms of dealing with the right to bodily privacy. That's the concern. Because the question is, did the policy in any way discriminate? And the answer is it did not. And it did not because it put people in the same situation they'd always been in, which was the males going to the male restroom, the females going to the females restroom. And here's a third alternative for anyone, including Gigi. But again, what was the harm? The harm that was expressed, there was concern expressed by parents of students about their privacy interests of their students. And that was the privacy interest was the primary concern of the school board in enforcing the existing policy of boys in the boys room, girls in the girls room, and then adding the availability of a third option. Which the children of any of those complaining parents have access to. They do, as does G. So I come back to the denial of the preliminary injunction changed the status quo in a way that actually ignores your client's effort to address the challenge by creating these unisex private restrooms. I don't think it, I don't see how it ignored the effort. Well, if your argument is that there were parents of certain students who were concerned, the board addressed that concern by creating these private restrooms. And so any of those students whose parents came to the board seeking redress now have access to the privacy that they claim they need and want. The first aspect, I understand the court's point. First aspect of a preliminary injunction is whether or not the plaintiffs are likely to win on the merits. Okay, let's move to that. How do you assess the district courts, as Judge Niemeyer put it, wanting to hear more about equal protection and yet denying the preliminary injunction? I'm not suggesting definitively that that's inconsistent or contradictory, but the judge wants to hear more of this case. And yet, by denying the preliminary injunction, the judge changed the status quo ante. The standard for- And there's a, at least there's a hint of an inconsistency there. I understand what your Honor's suggesting. And I understand the inconsistency that you're concerned about. The question is whether or not the plaintiff is likely to succeed. Let's just use the equal protection claim since he ruled on the Title IX claim. Our position was and is that all students are treated the same. There are two choices. Restrooms associated with their sex and single stall restrooms. Transgender is not a suspect class. None of the case law that plaintiffs rely on from the Price Waterhouse area deals with a situation similar to this. And none of the, all that case law deals with is non-conforming behavior and then some type of an employment action primarily undertaken against someone who is a male who wasn't acting in a male manner and therefore was punished. So the likelihood of success on equal protection clause is not strong. And the question is whether the Gloucester County School Board policy providing separate restrooms plus single stall restrooms for all students serves the governmental interest in protecting the safety and privacy of the students. If we get past our initial point, which is there never was any discrimination. And there never was any discrimination because the same policy was in existence from the beginning, which is boys in the boys' room, girls in the girls' room. And here's a third option. It would be discrimination to say to G, you can't go in the girls' room. That would be consistent with the Price Waterhouse set of facts. You're too masculine. You can't go in the girls' room. That would have been something that we couldn't do. So the notion on the other side of the case that you've remained, you've kept that alive. I don't think the school board had a choice. I think you have to allow this individual to use the girls' room if he so chooses. So your argument is rooted in this notion that some wise person said biology is destiny. But in fact, it's neurobiology, isn't it? That's destiny. I don't have an opinion on that. Our belief is that sex equals male and female. Well, of course, that's your position. But this is 2016. This is 2016. Yes, sir. And so the question is, as Judge Niemeyer suggested, what is the meaning of sex in the year 2016? Our position is that the meaning of sex is based on the person's genitalia, based on their natal sex, based on what they were born with. Could it change? Do you have expert evidence in the record? No expert evidence in the record. The judge didn't even require you to come forward with anything. Well, you've seen the record. The record is pretty sparse on these points. Are you going to be able to find a reputable psychologist or neuroscientist or psychiatrist to support your position that in 2016, all sex is biology? I haven't looked into that because we're nowhere near that in this case. I don't think it matters. I think the reason it doesn't matter is the question is whether or not this policy, as implemented, violates Title IX or violates the Equal Protection Clause, and it doesn't. If we decide that the department's regulation is entitled to our deference, does that change the calculus on the likelihood of success on the merits? First of all, obviously, we would argue that it is not entitled to deference, that the word sex is not ambiguous, and it means what it means. Yes, sir. The assumption is that we might do that. I think that we still have a chance to win the case under that, even if you give it deference, on the basis that the way that the OCR has interpreted this is to replace the word sex with the word gender identity, and that's not a fair reading, and I think that— Well, Price Waterhouse has largely already done that, hasn't he? I don't think so, no. And the progeny of Price Waterhouse? I thought we were well past the notion that sex, in terms of discrimination law, means no more and no less than biology. Well, again— I thought we were concerned about the stigmatizing effects of stereotypical approaches to gender roles, and if you talk about gender roles, it's impossible to not talk about gender identity, isn't it? Yes, and the point is, though, that those cases, and the Price Waterhouse itself, and the cases that follow it, what they— what you're dealing with is a situation where it's a too masculine female, a too feminine male, and you're dealing with you cannot discriminate on that basis. And yes, that is the law. There's no question about that. But that's not this situation. Our situation here is it is a school board with children from K through 12, age 6 to age 18. They have a policy of allowing girls in the girls' room and boys in the boys' room, and in their wisdom, provide a third option for anyone who is uncomfortable going to either spot. And the question is, does that violate the Equal Protection Clause, or does that violate Title IX? It does not. And that's our most significant argument, is that, very simply, that point. And I don't think, if you start getting into this complicated, where are we today in 2016, I think that's some other case. That's somewhere down the road. The question is, today, on these facts, with this scenario, with the concerns— Price Warehouse, those are adults in the workplace. That's a different scenario. This is children in a school system. And the right of privacy of children in the school system is much more significant than it would be for the bathroom in this courtroom, for instance. And that matters. And so this school system, the question is whether or not what they decided to do violated either Title IX or equal protection. Our argument is, very simply, that it did not. And that's our best argument. That's our main point, coming here before this Court today. I guess my concern is, you may be right. But, again, I'm sort of stuck on the notion that the denial of the preliminary injunction— of an affirmative injunction to the board. I mean, it's kind of flipped. Normally, a party coming into district court seeking a preliminary injunction is seeking to change the status quo. Well, by the time the plaintiff came to court— Or to maintain the status quo, I should say. By the time the plaintiff came to court— But by here, the district court's action actually changed the status quo. Again, with regard—I understand the policy was the animating legal action in play here. But down here on the ground, the way people were living with each other, and the way the school was being operated, without any complaints, for a good while at least— And I'm not sure there were any complaints by the students to the school officials. This came from the parents. The record is that at the school, there were no incidents. There were no incidents. There was no disruption. Things were proceeding apace. And then everything changed. For Gigi, certainly. For Gigi. For everyone else, everything remained the same in the sense of there was a boy's room and a girl's room, and you had those two options. And Gigi and everyone else then received the third option that's available. I think the court's argument would be stronger if the school had not given the third option, because I think that you would be then saying you have to go back— You have to go to the girl's room. And they're not saying you have to. You're saying you can go to the girl's room. But you also had this other option. So I think for that reason, what remained in place was not really a substantial change from the original situation. But there's no stigmatizing impact on anyone but Gigi in using what you refer to as the third option. The third option, I disagree. Potentially, if someone went in there, there could be potentially stigmatizing interest on anyone who went to use that restroom. Who knows whether they would feel stigmatized in some way, shape, or form for being— What would be the source of stigma? If suppose people were pro-transgender use of the boy's room, and that was the policy, and then people who started using that, then there might be a stigmatizing interest. Oh, you're against transgender people. You're a bigot. You're somebody who's uncomfortable with that. I mean, to me, that would be a potentially stigmatizing interest. But again, we're beyond the record talking about those types of things. And our major point is that the question is whether or not what was done is violative of either Title IX or equal protection, and it simply is not. If Gigi had a sex change operation, would you allow him to use the boy's restroom? My understanding of what the position would be—and I'm going to read the policy. It uses the word biological. Right. The shall be limited to corresponding biological genders is what it says. And I would say if you change your biological sex, then you would be allowed to use the restroom of your new biological sex. That's what—reading this, that's what it seems to suggest to me. Now, my understanding is that that surgery really—I'm no expert, believe me, but that surgery involves a series of surgeries. It's not a surgery. It's a series of surgeries. So when does one become a biological— I don't know. Whatever. I don't know the answer to that question. And so how would this policy apply to someone who was in the course of that surgical therapy? I don't know. I don't know. You don't know. I don't know how that would be resolved. I'd be speculating on what the school board—how they would interpret their policy. But they didn't discuss that. Not to my knowledge. It's certainly not part of the record. Did they get expert input into the— There's nothing in the record about expert input. There is—I don't know if it's in the record. The Johnston case out of Pennsylvania was informative to the school board, certainly in terms of the decision that it made. Felt like it was legally in a solid position. All right. Thank you, Mr. Corrigan. Mr. Block? Thank you, Your Honor. Two important points I want to clear up. One is the notion that boys were objecting to G's presence. We have no idea what these complaints were. They've never been shown to us, described to us, or to the court. And from looking at the school board meetings, the vast majority of complaints were about people worried that in the hypothetical future, some boy could pretend to be a girl and go into the locker rooms. So the notion that these complaints were coming from boys who were uncomfortable with G is certainly not in evidence on the P.I. motion, for one thing. A second point I wanted to make is—and this goes to this issue of what the school board knew and some of these harder line-drawing questions. This was something being handled by administrators on the ground who didn't see a problem. And what the school board did is they imposed a categorical rule saying regardless of the situation on the ground, school administrators never have the power to do anything but what the school board policy says. So this wasn't like a step-by-step incremental approach. G didn't come to the school board saying, I want you to pass a new policy saying all transgender kids should use the restrooms consistent with their gender identity, no exceptions. The school board brought— which is fascinating because today the best learning tells us that, you know, the principal is the CEO. And everything you read these days is what we need in public education are strong principles. And this principal was doing it. This principal had the situation under control, had the school operating from all that appears in the record in a really great way. And then some kind of top-down imposition comes along and disrupts what the principal was managing in a very, very humane and orderly way. It's ironic, isn't it? I agree, Your Honor. And the principal sponsor of the policy was clear. She said this isn't about disruption. These students are mature enough to handle it. It's not a disruption issue. It is solely a privacy issue. So there wasn't actually some crisis on the ground. There wasn't a mass walkout from the boys' restrooms. You know, stuff was working until the school board came involved. And, Your Honor, I also talked about these, you know, the school providing these extra privacy options. They announced that six days before the second school board meeting. And obviously, I haven't been able to depose anyone. But my understanding is that they were hoping that would head off the problem. But then six days later, after, you know, parent after parent or random community person after random community person threatened to vote the board out of office, you know, what had previously been, you know, 3-3 votes suddenly turned into a 5-1 vote. So no one gave these alternative arrangements a chance. They jumped from alternative arrangements to a categorical ban in six days before those restrooms were even installed. And they were in, if you look at the board meetings, it was never about, gee, it was always about this will open the door to some future sexual predator could come in. And their hypothetical concerns that we know from the administrators' amicus brief from school districts across the country, from L.A. to Kentucky, never actually materialized. And no one is saying that there's plenty of room for policies that ask for some sort of confirmation that this is really someone's sincerely held gender identity. Gee had a carrier letter from his doctor confirming this. No one's suggesting a top-down solution the other way. But in the Department of Education can always obviously issue guidance too. But what the district court ruled here is that the regulations mean that she automatically loses. And we're not saying the regulations mean he automatically wins. We're saying Title IX means he can't be treated differently on the basis of sex. And there's not an exception in the regulations that authorizes it. But certainly there's room for additional guidance and plenty of model policies for school boards to look at as well. Very briefly, this issue of adults versus schools. Title IX is broader than Title VII. Jackson versus Birmingham says that. And schools have a special, it's also important for transgender students too. You know, we know from Plyler that a denial of an equal education has lifelong consequences that can be far worse than denial of a job. So the importance of education cuts in our benefit, not theirs. If your honors don't have any further questions, that's all I have for today. Thank you.
judges: Paul V. Niemeyer, Henry F. Floyd, Andre M. Davis